TRIBUNAL DE APELACIONES
PANEL III

| AMBASSADOR VETERAN'S SERVICES OF PUERTO RICO, LLC.<br><br>Parte Apelante<br><br>v.<br><br>ESTADO LIBRE ASOCIADO DE PUERTO RICO<br><br>Parte Apelada | KLAN202400851 | *Apelación,* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso Núm.: SJ2023CV11224<br><br>Sala:603<br><br>Sobre: Incumplimiento de Contrato, Injunction (Entredicho Provisional), Injunction Preliminar y Permanente, Daños |

Panel integrado por su presidente, el Juez Figueroa Cabán, el Juez Salgado Schwarz y el Juez Monge Gómez.

Monge Gómez, Juez Ponente

### SENTENCIA

En San Juan, Puerto Rico, a 16 de octubre de 2024.

Compareció ante este Tribunal la parte apelante, Ambassador Veterans Services of Puerto Rico, LLC (en adelante, "Ambassador" o el "Apelante"), mediante recurso de apelación presentado el 16 de septiembre de 2024. Nos solicitó la revocación de la *Sentencia* dictada por el Tribunal de Primera Instancia, Sala Superior de San Juan (en adelante, el "TPI"), el 9 de julio de 2024, notificada y archivada en autos al día siguiente. Dicho dictamen fue objeto de una "**Moción de Reconsideración**" interpuesta por el Apelante, la cual fue declarada "No Ha Lugar" el 12 de agosto de 2024.

Por los fundamentos que expondremos a continuación, se *revoca* la *Sentencia* apelada.

### I.

El caso de autos se originó el 1 de diciembre de 2023, con la presentación de una "**Demanda Jurada y Solicitud de Interdicto**" (en adelante, la "Demanda") por parte de Ambassador en contra de la Oficina del Procurador de Veteranos de Puerto Rico (en adelante, "OPV") sobre

Número Identificador
SEN2024_____

incumplimiento de contrato, interdicto, remedios provisionales y daños y perjuicios. Mediante la misma, expresó que la Casa del Veterano es una propiedad perteneciente al Gobierno de Puerto Rico (en adelante, el "Gobierno" o el "Apelado"), bajo la administración de la OPV, donde los veteranos puertorriqueños reciben tratamiento médico o de hospicio. Asimismo, alegó que, a través de cierto contrato intitulado "Design-Build, Financing, Operation, Management and Maintenance Agreement", la OPV le cedió el manejo y administración de la referida propiedad. Argumentó que la OPV se obligó a entregarle los pagos recibidos de parte de las agencias federales pertinentes para cubrir los gastos incurridos por motivos de emergencia. Arguyó que la OPV retiene ciertos fondos que fueron hechos disponibles por el gobierno federal para aliviar los gastos incurridos por la pandemia, a pesar de su obligación contractual de distribuirlos. Alegó que ha solicitado en más de una ocasión el desembolso de estos fondos para sufragar los gastos incurridos, incluyendo el pago de nóminas y salarios, pero no ha tenido éxito.

De igual manera, indicó que, si los fondos provenientes de la *Federal Emergency Management Agency* (en adelante, "FEMA") no son utilizados, serán revertidos al gobierno federal. Manifestó que la falta de cumplimiento de las obligaciones contractuales por parte de la OPV ha tenido un impacto económico sustancial en Ambassador, incluyendo atrasos de pagos por situaciones de contabilidad, acumulación de intereses en deudas exigibles, riesgos de suspensión del servicio de electricidad y renuncias de empleados.

A tenor con lo anterior, le peticionó al TPI lo siguiente: (1) que emita un interdicto preliminar para evitar la pérdida de fondos federales; (2) ordene la consignación de los referidos fondos; (3) le ordene a la OPV el pago y desembolso del dinero en cuestión; (4) imponga el pago de los daños provocados por el incumplimiento doloso de la OPV y (5) emita un interdicto permanente para evitar incumplimientos futuros. Varios días después, específicamente, el 8 de diciembre de 2023, Ambassador presentó una "**Moción de Embargo a Tenor con la Regla 56**" mediante la

cual le solicitó al TPI que le ordene a la OPV el depósito de la cantidad de $624,980.41, por concepto de las facturas de COVID-19 reclamadas y $361,268.91 de fondos de FEMA.

Posteriormente, el 15 de diciembre de 2023, el Gobierno, en representación de la OPV, presentó una "**Moción de Desestimación**" a través de la cual alegó que procedía disponer de la "**Demanda**" en controversia, bajo el fundamento de que no exponía una reclamación que justificara la concesión de un remedio. En detalle, sostuvo que Ambassador no poseía legitimación activa para instar las causas de acción en cuestión. Asimismo, argumentó que las alegaciones del Apelante no son suficientes para establecer que la OPV incurrió en incumplimiento contractual, puesto que no especifica la fecha en que supuestamente FEMA le concedió unos fondos de subvención para cubrir los gastos de la Casa del Veterano, ni que Ambassador cubrió esos gastos con sus propios fondos. Del mismo modo, enfatizó que los fondos públicos no son objeto de embargo. Además, señaló que no se satisfacían los requisitos del mecanismo procesal de interdicto, ya que Ambassador poseía un remedio apropiado en ley y no había demostrado haber sufrido un daño irreparable.

Oportunamente, el 22 de diciembre de 2023, Ambassador presentó su "**Oposición a Moción de Desestimación y en Cumplimiento de Orden**" en la que reafirmó los argumentos expuestos en su *Demanda* y aclaró que el hecho de que el Gobierno entienda que el incumplimiento contractual no ha ocurrido, no significa que Ambassador no posea legitimación activa para instar la acción. Igualmente, expresó que el Gobierno le negó acceso a información requerida y necesaria y, además, utilizó ese hecho a su favor para alegar que Ambassador no incluyó esa información en la *Demanda*. También enunció que los fondos reclamados en la presente controversia no le pertenecen a la OPV ni surgen del presupuesto general del Gobierno, por lo que el embargo de los fondos del gobierno federal no tiene el efecto de desviar fondos estatales para usos privados. Por todo lo anterior, le solicitó al foro primario la denegación de la "**Moción de Desestimación**".

Así las cosas, el 9 de enero de 2024, Ambassador presentó un "**Aviso de Desistimiento sin Perjuicio**" a través del cual desistió de las reclamaciones de interdicto e interdicto provisional. El 9 de enero de 2024, el TPI declaró "Ha Lugar" dicha solicitud, ordenando así el archivo, sin perjuicio, de las referidas reclamaciones. El 23 de febrero de 2024, el Gobierno presentó su "**Contestación a Demanda**" mediante la cual negó la mayoría de las alegaciones expuestas en su contra y alegó afirmativamente que los fondos de FEMA fueron solicitados y aprobados antes de que las partes suscribieran el contrato en controversia. Respecto a los fondos relacionados a la pandemia del COVID-19, expresó que estos fueron recibidos en el año 2021, previo a la firma del contrato entre las partes y que al no provenir de FEMA no estaban contemplados en dicho acuerdo. Indicó que tampoco se dan las circunstancias especiales para que Ambassador pueda procurar los fondos. Igualmente, expresó que, al firmar el aludido contrato, el Apelante asumió todos los costos de la Casa del Veterano y todo lo relacionado a las mejoras de su infraestructura. Así pues, le solicitó al TPI que declare "No Ha Lugar" la *Demanda*.

El 8 de mayo de 2024, el Gobierno presentó una segunda "**Moción en Solicitud de Desestimación**" en la que reiteró los argumentos esbozados en su primera "**Moción de Desestimación**" y aseveró que el Apelante no posee derecho alguno sobre los fondos federales en controversia. Además, mencionó que utilizó los fondos federales relacionados con la pandemia para cubrir ciertos gastos de Ambassador incluyendo un "chiller", un generador eléctrico y un tanque para almacenar "diesel". Explicó que el proceso de adquisición de estos productos está por concluir. Por último, señaló que Ambassador solicitó asistencia financiera bajo el programa federal conocido como "Paycheck Protection Program", el cual fue promulgado al amparo del "The Coronavirus Aid, Relief and Economic Security Act" (en adelante, "CARES Act"), por lo que ya se había beneficiado de estos fondos federales. A tenor con lo anterior, le solicitó al TPI la desestimación, con perjuicio, de las causas de acción instadas en su contra.

Más adelante, el 31 de mayo de 2024, Ambassador presentó una "**Oposición a Moción de Desestimación**" mediante la cual expresó que no procedía la desestimación del caso puesto que la "**Moción en Solicitud de Desestimación**" fue presentada 75 días de presentarse la "**Contestación a la Demanda**" y existía un remedio en derecho para sus alegaciones y reclamaciones, siendo este el cumplimiento de lo dispuesto en el aludido contrato. De igual forma, señaló que el Gobierno incluyó alegaciones que no surgían de la *Demanda* y que requerían presentación de prueba. Además, manifestó que no existe requisito alguno relacionado a que los fondos federales tenían que ser recibidos y distribuidos durante la vigencia del contrato en cuestión. En virtud de lo anterior, solicitó la continuación de los procedimientos.

El 15 de mayo de 2024, se llevó a cabo la *Conferencia Inicial*. Allí, el foro primario le permitió a Ambassador enmendar su *Demanda*. El 14 de junio de 2024, Ambassador presentó una "**Demanda Enmendada y Solicitud de Interdicto**" (en adelante, "Demanda Enmendada"), a los fines de mencionar cierto contrato suscrito el 1 de junio de 2014, intitulado "State Veterans Home Facilities Operation, Management, Maintenance" y eliminar las solicitudes de consignación e interdicto preliminar. De igual manera, expresó que, en el año 2021, el Departamento de Asuntos de Veteranos de los Estados Unidos informó la distribución de un billón de dólares provenientes de fondos federales destinados a las casas de veteranos estatales en los distintos estados y territorios de los Estados Unidos.

Finalmente, el 9 de julio de 2024, el TPI dictó *Sentencia* mediante la que determinó que Ambassador no tenía derecho a los fondos federales provenientes de FEMA y del programa CARES Act. Específicamente, indicó que no existe una alegación en la *Demanda* que establezca que Ambassador realizó reparaciones a la Casa del Veterano y que éstas fueron sufragadas con su dinero, requisito necesario para solicitar el desembolso de los fondos federales. De igual manera, concluyó que la OPV, por disposición contractual, no posee ninguna obligación de cubrir la nómina de los empleados de Ambassador. En armonía con lo anterior,

declaró "Ha Lugar" la "**Moción en Solicitud de Desestimación**" interpuesta por el Gobierno y desestimó la *Demanda Enmendada*. Insatisfecho con esta determinación, el 9 de agosto de 2024, Ambassador presentó una "**Moción de Reconsideración**", la cual fue declarada "No Ha Lugar" mediante *Resolución* de 12 de agosto de 2024.

Aún inconforme con lo anteriormente resuelto, el Apelante acudió ante este Tribunal mediante el recurso de epígrafe, en el que señaló los siguientes errores:

a. **Erró el TPI al considerar la Moción de Desestimación dentro del marco de la Demanda Original y la Contestación a la Demanda Original, y no de la Demanda Enmendada.**

b. **Erró el TPI al desestimar la Demanda presentada por AVS por una alegada "falta de evidencia", y no usar el estándar legal aplicable a la moción de desestimación bajo la        Regla 10.2 (5), considerando como ciertas las alegaciones de la Demanda Enmendada.**

c. **Erró el TPI al interpretar las disposiciones contractuales relacionadas a la obligación de distribuir fondos como limitadas únicamente a fondos de FEMA.**

d. **Erró el TPI al interpretar los estatutos federales**.

El 11 de octubre de 2024, el Gobierno presentó su "**Alegato del Estado**".

Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

**II.**

**A.**

La Regla 10.2 de Procedimiento Civil y su jurisprudencia interpretativa le confiere al demandado la oportunidad de presentar cualquiera de las siguientes defensas: (1) falta de jurisdicción sobre la materia; (2) falta de jurisdicción sobre la persona; (3) insuficiencia del emplazamiento; (4) insuficiencia del diligenciamiento del emplazamiento; (5**) las alegaciones del demandante dejan de exponer una reclamación que justifique la concesión de un remedio**; y (6) la falta de una parte indispensable. 32 LPRA Ap. V, R. 10.2 (énfasis suplido).

La moción de desestimación bajo la referida Regla es una defensa que formula el demandado antes de presentar su contestación a la demanda, en la cual solicita que se desestime la demanda presentada en su contra. Aut. Tierras v. Moreno & Ruiz Dey. Corp., 174 DPR 409, 428 (2008); Colón v. Lotería, 167 DPR 625, 649 (2006). En general, la Regla 10.2 de Procedimiento Civil, supra, recoge defensas que pueden plantearse, a opción del demandado, en una moción de desestimación antes de contestar o en la misma contestación a la demanda. Casillas Carrasquillo v. ELA, 209 DPR 240, 247 (2022).

Al examinar una moción de desestimación, **los tribunales están obligados a aceptar como ciertos todos los hechos bien alegados en la demanda y a interpretarlos de la manera más beneficiosa para el demandante**. Comisión v. González Freyre *et al.*, 211 DPR 579, 614-615 (2023). Cabe destacar que esta doctrina se limita a hechos que están formulados de manera clara y concluyente, sin dejar lugar a dudas. First Fed. Savs v. Asoc. De Condómines, 114 DPR 426, 431-432 (1983). De igual manera, el tribunal debe conceder el beneficio de todas las inferencias posibles que puedan derivarse de los hechos correctamente expuestos en la demanda. Montañez v. Hosp. Metropolitano, 157 DPR 96, 105 (2002). No obstante, estas admisiones se consideran únicamente para los fines de la moción y no son definitivas ni incuestionables de manera que constituyan una renuncia a cualquier controversia material que deba ser dilucidada a través de la presentación de la prueba en el juicio. Íd., pág. 103.

**B.**

Es pilar fundamental de nuestro acervo contractual puertorriqueño el principio de la libertad de contratación. Arthur Young & Co. v. Vega III, 136 DPR 157, 169 (1994). A base de éste, las partes contratantes pueden establecer las condiciones que tengan por conveniente, siempre que éstas no sean contrarias a la ley, a la moral o al orden público. 31 LPRA sec. 6242. Así, se posibilita que las partes puedan contratar cuando quieran, como quieran y con quien quieran. J. Puig Brutau, Fundamentos de

Derecho Civil: Doctrina General del Contrato, 3ra ed., Barcelona, Ed. Bosch, 1988, T. II, Vol. I, pág. 5.

Es norma sólidamente establecida en nuestra jurisdicción que el contrato tiene fuerza de ley entre las partes, por lo que desde el momento de su perfeccionamiento cada contratante debe actuar de buena fe en el cumplimiento de su obligación. 31 LPRA sec. 9754; 31 LPRA sec. 8983. Es por ello que existe un contrato desde que dos o más partes expresan su consentimiento en la forma prevista por la ley, para crear, regular, modificar o extinguir obligaciones. 31 LPRA sec. 9751.

En ese sentido, un contrato es vinculante desde que concurren los siguientes requisitos: (1) consentimiento de los contratantes; (2) objeto determinable y (3) causa lícita. 31 LPRA 6131; 31 LPRA sec. 6142; Díaz Ayala *et al.* v. E.L.A., 153 DPR 675, 690-691 (2001). Consecuentemente, "cuando la ley no designa una forma para la realización de un negocio jurídico, se puede utilizar aquella que se considere conveniente". 31 LPRA sec. 6161.

Ahora bien, en los contratos con prestaciones recíprocas se encuentra implícita la facultad de resolver el contrato por falta de cumplimiento con una obligación principal. 31 LPRA sec. 9823. Esto es, el perjudicado puede reclamar el cumplimiento del contrato o la resolución de la obligación con el resarcimiento de los daños causados. Íd. El incumplimiento de una obligación recíproca conlleva un efecto resolutorio siempre que la obligación incumplida sea una esencial o que su cumplimento constituya el motivo del contrato para la otra parte. NECA Mortg. Corp. v. A&W Dev. S.E., 137 DPR 860, 875 (1995). Así, nuestro más alto foro ha expresado que:

> La exigencia de que la obligación incumplida sea la principal responde a un interés superior, acorde con el principio de la buena fe, de evitar el abuso en el ejercicio de las acciones resolutorias, promover el cumplimiento de los contratos e impedir que, a través de una infracción menor, una de las partes trate de liberarse del vínculo porque ya no le conviene o no le interesa. Los tribunales deberán tener bien presente que el Art. 1077 del Código Civil, *supra*, dispone que el tribunal decretará la resolución si no existen causas justificadas que le autoricen para señalar un plazo. Íd., págs. 875-876 (cita omitida).

En materia contractual, es norma conocida que, "si los términos de un negocio jurídico bilateral son claros y no dejan duda sobre la intención de las partes, se estará al sentido literal de sus palabras". 31 LPRA sec. 6342. Es por ello que nuestro Tribunal Supremo ha reconocido que cuando los términos de un contrato, sus condiciones y sus exclusiones son claros y específicos, y no dan margen a ambigüedades o diferentes interpretaciones, así deben aplicarse. San Luis Center Apts. *et al.* v. Triple-S, 208 DPR 824, 832 (2022); Rivera Rodríguez v. Rivera Reyes, 168 DPR 193, 212 (2006).

No obstante, cuando de la lectura del texto, las cláusulas no son claras y consistentes o no permiten una comprensión única de lo acordado, los tribunales estamos llamados a interpretar el contrato partiendo de la verdadera y común intención de las partes. Merle v. West Bend Co., 97 DPR 403, 409-410 (1969). Igualmente, se debe presuponer la "lealtad, corrección y buena fe en su redacción, e interpretarlo de manera tal que lleve a resultados conformes a la relación contractual y que estén de acuerdo con las normas éticas". SLG Irizarry v. SLG García, 155 DPR 713, 726 (2001).

Partiendo de esta premisa, al momento de interpretar el contrato y establecer cuál es la intención de las partes, debemos recurrir a las normas de hermenéutica contractual establecidas en los Artículos 353 al 358 del Código Civil de Puerto Rico, 31 LPRA secs. 6341-6346. En lo específico a la controversia ante nos, el Código Civil establece que, si el negocio jurídico es bilateral, la disposición ambigua debe interpretarse en sentido desfavorable a quien la redactó y en favor de la parte que tuvo menor poder de negociación. 31 LPRA sec. 6346. Por otro lado, las cláusulas del contrato se interpretarán "las unas por medio de las otras, ya pertenezcan al mismo negocio jurídico, ya a negocios jurídicos conexos, y mediante la atribución del sentido apropiado al conjunto". 31 LPRA sec. 6344. Es decir, se analizarán en su totalidad con el propósito de entender su verdadero significado. CNA Casualty of P.R. v. Torres Díaz, 141 DPR 27, 39 (1996).

**C.**

"Nuestro ordenamiento procesal no establece requisitos complicados para la redacción de una demanda. Meramente se exige que el escrito comprenda una relación sucinta y sencilla de los hechos demostrativos de que la parte peticionaria tiene derecho a un remedio". León Torres v. Rivera Lebrón, 204 DPR 20, 40 (2020), interpretando la Regla 6.1 de Procedimiento Civil, 32 LPRA Ap. V, R 6.1.

En cuanto a las alegaciones, la Regla 6.1 de Procedimiento Civil, *supra*, dispone que, una alegación que exponga una solicitud de remedio contendrá lo siguiente: "(1) Una relación sucinta y sencilla de los hechos demostrativos de que la parte peticionaria tiene derecho a un remedio; y (2) una solicitud del remedio a que crea tener derecho. Podrán ser solicitados remedios alternativos o de diversa naturaleza". Íd. Conforme a lo anterior, "no tienen que exponerse detalladamente en la demanda todos los hechos que dan base a la reclamación". León Torres v. Rivera Lebrón, *supra*, pág. 40 (citando el Informe de Reglas de Procedimiento Civil, Secretariado de la Conferencia Judicial y Notarial, diciembre 2007, Vol. I, pág. 70). Lo esencial es que, "a la luz de las alegaciones de la demanda, los demandados estén razonablemente prevenidos de lo que los demandantes intentan reclamar". Ortiz Díaz v. R & R Motors Sales Corp., 131 DPR 829, 835 (1992). Ahora bien, es norma reiterada que, "las alegaciones se interpretarán de manera conjunta y liberalmente a favor de la parte demandante, con el objetivo de hacer justicia". León Torres v. Rivera Lebrón, *supra*, pág. 40; Torres, Torres v. Torres, 179 DPR 481, 501 (2010). En fin, nuestro más Alto Foro reiteradamente ha "advertido que el propósito de las alegaciones es notificar a la parte contraria, a grandes rasgos, de las reclamaciones en su contra para, de este modo, brindarle la oportunidad de comparecer al proceso y defenderse, si es que lo desea". Íd., pág. 41.

Por otro lado, la Regla 6.5 de Procedimiento Civil establece que "[c]ada aseveración en una alegación será sencilla, concisa y directa. No se exigirán fórmulas técnicas para la redacción de las alegaciones o

mociones. Todas las alegaciones se interpretarán con el propósito de hacer justicia". 32 LPRA Ap. V, R. 6.5. De otra parte, dispone que, sujeto a lo dispuesto en la Regla 9, una parte podrá formular en la alternativa cuantas reclamaciones o defensas tenga, aunque sean incompatibles. Íd.

En ese sentido, el documento debe incluir "un mínimo de detalle que informe sobre los alegados actos lesivos que causaron el alegado perjuicio". León Torres v. Rivera Lebrón, *supra*, pág. 41, citando a J.A. Echevarría Vargas, *Procedimiento Civil Puertorriqueño*, 1ra ed. rev., [s. l.], [ed. del autor], 2012, pág. 86. En concreto, "debe contener un grado suficiente de información sobre las imputaciones de suerte que le permita a la parte demandada entender la sustancia de lo que debe defender. De lo contrario la parte en la defensiva tendría que adivinar las causas a ser litigadas en su contra". Íd., pág. 80.

Asimismo, el Tribunal Supremo ha resuelto que "en la demanda 'no hay que especificar bajo qué disposición legal se reclama, basta con que de los hechos que esquemáticamente se alegan surja una causa de acción bajo cualquier ley'". Dorante v. Wrangler de P.R., 145 DPR 408, 414 (1998); Rivera Flores v. Cía. ABC, 138 DPR 1, 8 (1995). Después de todo, los tribunales conceden lo que en derecho procede, no lo que se les pide, aunque el remedio haya sido solicitado en la súplica o en las alegaciones. Íd., pág. 414; Rivera Flores v. Cía. ABC, *supra*. "Son los hechos alegados y no el título o súplica de la demanda lo que constituye la base determinante de la existencia de una causa de acción." Íd. (citando a Granados Navedo v. Rodríguez Estrada I, 124 DPR 1 (1989)).

**III.**

En el presente caso, el Apelante nos solicitó la revocación de la *Sentencia* del TPI, a través de la cual se declaró "Ha Lugar" la "**Moción en Solicitud de Desestimación**" presentada por el Gobierno.

Los cuatro (4) señalamientos de error esgrimidos están íntimamente relacionados, por lo que se abordarán de manera conjunta en la discusión. En síntesis, Ambassador plantea que el foro primario erró al: (1) considerar la *Moción de Desestimación* dentro del marco de la primera "**Demanda**" y

no de la "**Demanda Enmendada**"; (2) desestimar la causa de acción bajo el fundamento de ausencia de evidencia; (3) no utilizar el estándar legal aplicable a la moción de desestimación bajo la Regla 10.2, *supra*, y finalmente (4) al interpretar los estatutos federales. Veamos.

Surge del expediente ante nuestra consideración que el 1 de junio de 2014, la OVP suscribió con Ambassador cierto contrato intitulado "State Veterans Home Facilities Operation, Management, Maintenance and Lease Agreement" mediante el cual le cedió el manejo y administración de la Casa del Veterano al Apelante. Ocho (8) años después, el 1 de julio de 2022, firmaron un nuevo contrato titulado "Design-Build, Financing, Operation, Management and Maintenance Agreement for "La Casa del Veterano" at Juana Díaz, Puerto Rico", en el que se acordó que Ambassador continuaría gestionando y administrando la referida propiedad. Entre las disposiciones de este contrato, se encuentran las siguientes:

> Section 14. EMPLOYEES. STAFFING PATTERN
>
> AVS-PR [Ambassador] shall maintain and hire such number of employees at the facilities as it shall deem necessary and/or convenient for the proper and adequate operation of the Facilities and the services to be provided thereat, based on a staffing pattern consistent with the staffing patterns expected for VSH'S as per USDVA'S standards. The employees employed to work at the Facilities (herein the "Employees") shall all be employees of AVS-PR (except for the facilities Monitor, which shall be an employee at PRVAO).
>
> **PRVAO [OVP] shall not have any single responsibility or financial relating AVS-PR's [Ambassador's] employees working at the Facilities (including without limitation, for wages, salaries, compensations, benefits, overtime, etc.)** for which AVS-PR [Ambassador] agrees to indemnify and hereby releases and holds PRVA [OVP] and the Government of the Commonwealth of Puerto Rico harmless, from any claims of liabilities relating to the Employee, except relating to the negligence of gross negligence of the PRVAO [OVP], or any and all other duties and obligations of the PRVAO [OVP] that the PRVAO cannot by law be delegated or otherwise dismissed.[1] (Énfasis suplido).
>
> […]
>
> (n) PAYMENT FROM THE FEDERAL EMERGENCY MANAGEMENT AGENCY (FEMA).
> **In case that PRVAO [OVP] receives any grant funds to cover pre and/or pre-emergency or disaster related projects at the Facilities, that may be used to cover <u>payroll expenses</u> incurred for the operation of the Facilities, those funds will be made available to AVS-PR**

---

[1] *Véase*, Apéndice del Recurso de Apelación, pág. 46 (énfasis suplido).

**by PVAO for those purposes**. Monies from any grant funds provided to PRVAO to cover expenses related to needed repairs to the Facilities for damages caused by the emergency or disaster, will only be made available to AVS-PR by PRVAO, once those repairs have been undertaken by AVS-PR, from it owns funds.[2]

Por su parte, entre los años 2017 y 2020, el Gobierno de los Estados Unidos, a través de FEMA, el CARES Act y el "American Rescue Plan" (en adelante, "ARP Act") le ofreció apoyo financiero a Puerto Rico para aliviar y reducir los efectos económicos causados por el Huracán María y la pandemia del COVID-19. Este respaldo económico también estaba destinado a la Casa de Veteranos.

Conforme hemos adelantado en los acápites anteriores, la Regla 10.2 de Procedimiento Civil, *supra*, le permite al demandado solicitar la desestimación de la causa de acción instada en su contra, bajo el fundamento de que las alegaciones del demandante dejan de exponer una reclamación que justifique la concesión de un remedio. Ante una moción de esta naturaleza, el tribunal está obligado a tomar como ciertos todos los hechos bien alegados en la demanda y a interpretarlos de la manera más favorable para el demandante. Comisión v. González Freyre *et al.*, *supra*, págs. 614-615. Igualmente, debe conceder el beneficio de todas las inferencias posibles que puedan derivarse de los hechos debidamente presentados en la demanda. Montañez v. Hosp. Metropolitano, *supra*, pág. 105.

Por su parte, lo único que requiere nuestro ordenamiento jurídico en torno a las alegaciones es una relación sencilla y sucinta de los hechos que demuestren que la parte suscribiente puede tener derecho a un remedio. Regla 6.1 de Procedimiento Civil, *supra*. Una alegación corta, clara, simple, concisa y directa será suficiente. De este modo, no se exigirán fórmulas técnicas para la redacción de las alegaciones ni será necesario que éstas sean probadas a través de la demanda, ya que las alegaciones se interpretarán con el propósito de hacer justicia. Regla 6.5 de Procedimiento Civil, *supra.* Lo esencial es que, "los demandados estén

---

[2] *Véase*, Apéndice del Recurso de Apelación, pág. 59 (énfasis suplido).

razonablemente prevenidos de lo que los demandantes intentan reclamar".

Ortiz Díaz v. R & R Motors Sales Corp., *supra*, pág. 835.

En aras de determinar la suficiencia de las alegaciones impugnadas, procede examinar lo argumentado por Ambassador, cuyas alegaciones el Gobierno solicitó la desestimación ante el TPI. Veamos.

En lo estrictamente pertinente al recurso ante nos, Ambassador alegó, entre otras cosas, lo siguiente:

> Desde el 1 de junio de 2014, mediante un contrato titulado "State Veterans Home Facilities Operation, Management, Maintenance and Lease Agreement" la OPV le cedió a AVS [Ambassador] el manejo y administración de la Propiedad en Juana Díaz.
>
> […]
>
> 4. En el 2020, ante la pandemia del Covid-19, el gobierno federal promulgó el Coronavirus Aid, Relief, Economic and Security Act ("CARES Act") y el American Rescue Plan ("ARP Act") el mismo año. Por vía de estos estatutos federales, el gobierno de los Estados Unidos ofreció asistencia económica a varios sectores del país para minimizar los efectos económicos de la pandemia.
>
> 5. En el 2021, el Departamento de Asuntos de Veteranos de los Estados Unidos informó la distribución de un billón de dólares provenientes de fondos federales destinados a las casas de veteranos estatales en los distintitos estados y territorios de los Estados Unidos.
>
> 6. La Propiedad es la única casa de veteranos estatal en Puerto Rico, por lo que los fondos provenientes de los estatutos federales mencionados no tienen recipiente adicional en Puerto Rico que no sea la Propiedad, que es manejada y administrada únicamente por la AVS.
>
> 7. Según las propias guías del gobierno federal, los fondos provenientes de tanto el CARES Act como el ARP Act requieren que los pagos se emitan solo para cubrir los gastos imprevistos incurridos por razón de la pandemia durante el periodo comenzando el 1 de marzo de 2020, y culminando el 31 de marzo de 2021.
>
> 8. **Desde el comienzo de la pandemia, AVS [Ambassador] ha presentado evidencia de los costos incurridos a la OPV[,] en aras de recibir los fondos federales destinados para la Propiedad**. **No obstante, la OPV ha negado desembolsar los fondos federales recibidos para estos propósitos y aun retiene una cantidad desconocida de estos fondos sin usarse.**
>
> 9. Además, el 1 de julio de 2022, AVS [Ambassador] y la OPV suscribieron un contrato de administración y manejo titulado "Design-Build, Financing, Operation, Management and Maintenance Agreement for 'La Casa Del Veterano' at Juana Diaz, Puerto Rico".

10. Como parte del Contrato, la OPV asumió la obligación de hacer disponible todos los fondos provenientes del gobierno federal que haya recibido para cubrir gastos de emergencias, incluyendo aquellos incurridos antes, durante o después la mencionada emergencia.

[…]

12. Según surge del mismo contrato, la OPV se obligó a hacer cualquier fondo o subvención recibida para manejar gastos extraordinarios por emergencias disponibles a AVS [Ambassador], incluyendo gastos de nóminas que surjan de dicha emergencia.

13. **No obstante lo esbozado anteriormente, en múltiples instancias, AVS [Ambassador] ha solicitado el desembolso de los fondos mencionados en la Sección 29(n) para cubrir los gastos que incurrió por la pandemia de Covid-19, incluyendo el pago de nóminas y salarios, que son parte de la disposición contractual relacionada y de la disposición federal que hace esos fondos disponibles**.[3]

Mediante la *Moción de Desestimación*, el Gobierno sostuvo que procedía la disposición de la reclamación instada en su contra, argumentando que, de una somera lectura de las cláusulas del Contrato, no se deduce que tenga alguna obligación. De igual forma, alegó que Ambassador es quien incumplió con el Contrato, al no haber proporcionado una serie de documentos, entre ellos, la evidencia de una fianza no menor de $800,000.00 y varias certificaciones. Veamos.

Al analizar los planteamientos expuestos por ambas partes sobre la solicitud de desestimación presentada por el Gobierno, el TPI determinó que Ambassador no tenía derecho a los fondos federales. Específicamente, manifestó que no existe una alegación en la Demanda que condujera a concluir que las reparaciones fueron realizadas y concluidas por Ambassador con su dinero. Expresó que de las alegaciones tampoco surgía que el Apelante haya procurado un trámite donde concretamente le haya sometido a la OPV las facturas de lo que tuvo que desembolsar por razón de los gastos que alega que incurrió. Respecto al pago de nóminas y salarios, el foro primario concluyó que no se le había puesto en posición para evaluar su petición. Añadió que basado en la sección 14 del Contrato en controversia, la OVP no poseía ninguna

---

[3] *Véase*, Apéndice del Recurso de Apelación, págs. 244-256 (énfasis suplido).

responsabilidad para cubrir la nómina de los empleados del Apelante que laboran en la Casa del Veterano.

Es nuestro parecer que dicho análisis se distancia de las pautas normativas reconocidas en nuestra jurisdicción y no se atempera con la realidad fáctica y procesal del caso. Nos explicamos.

Tras un análisis exhaustivo y detallado del expediente ante nuestra consideración, de los autos electrónicos del TPI y de los documentos que obran en él, y tomando como ciertos todos los hechos bien alegados en la *Demanda Enmendada*, hemos arribado a la conclusión de que no procedía la desestimación del presente caso. Esto pues, las alegaciones del Apelante cumplieron con el requisito de suficiencia que requiere nuestro ordenamiento jurídico. Adviértase que nuestro derecho procesal no exige que la parte demandante pruebe sus alegaciones en la demanda, ni tampoco requiere que se presente prueba documental en una etapa tan temprana de los procedimientos.

A esos efectos, es suficiente con que se proporcione una relación sencilla y breve de los hechos que demuestran que la parte promovente de la acción tiene derecho a un remedio. Ambassador cumplió con dicho requisito al señalar que el gobierno federal asignó ciertos fondos a los estados y territorios, al alegar tener derecho a ellos a través de los Contratos suscritos con la OPV y expresar que reclamó los costos incurridos y solicitó su desembolso. El hecho de que Ambassador no hubiera hecho referencia a unas facturas específicas mediante las cuales se pudiera evidenciar los gastos incurridos, no implica que las alegaciones que esgrimió en la *Demanda Enmendada* no fueran suficientes y no establecieran una causa de acción que justificara la concesión de un remedio. Claro está, tras un descubrimiento de prueba, le corresponderá al Apelante, como parte promovente, aportar aquella evidencia que establezca los gastos que reclama en la *Demanda Enmendada*, así como el restante de las causas de acción acumuladas.

Correctamente, el foro primario expresó que los fondos de FEMA estarían disponibles sólo cuando el Apelante hubiera efectuado

reparaciones o gastos por su cuenta. Ahora bien, concluyó que Ambassador estaba impedido de reclamar los mismos, puesto que no existía una alegación que condujera a concluir que las reparaciones fueron realizadas y concluidas por el Apelante bajo su peculio, de suerte que pudiera solicitar tal reembolso. Nada más lejos de la verdad. Conforme hemos adelantado y citado *ad verbatim*, Ambassador específicamente alegó que efectuó unos gastos relacionados con el *Contrato* y que la OVP no ha hecho los mismos disponibles. Por tanto, contrario a lo resuelto por el TPI, la activación de la sección núm. 29 (n) del *Contrato* no es prematura.

Por otro lado, en la *Sentencia* apelada, el TPI equiparó las secciones 14 y 29 (n) de la parte III del *Contrato* en controversia para concluir que los empleados de Ambassador no tenían derecho a los fondos federales. Sin embargo, es fundamental establecer que tras un análisis de ambas disposiciones contractuales, estamos convencidos de que estas secciones atienden asuntos distintos.

Al examinar la sección 14 del *Contrato* notamos que la misma establece que la OVP no tiene ningún tipo de responsabilidad u obligación financiera para con los empleados de Ambassador que destacaran en las facilidades para efectuar los trabajos, según pactados. Asimismo, la aludida sección contractual dispone que ello incluye salarios, compensaciones y beneficios, entre otros. Por su parte, la sección 29 (n) del *Contrato* dispone que en caso de que la OVP reciba cualquier fondo subvencionado por FEMA para cubrir proyectos relacionados a emergencias o desastres en las instalaciones, **los mismos pueden utilizarse para cubrir los gastos de nómina incurridos para la operación de la Casa del Veterano** ("In case that PRVAO (Estado) receives any grant funds to cover pre and/or pre-emergency or disaster related projects at the Facilities, **that may be used to cover payroll expenses incurred for the operation of the Facilities**, those funds will be made available to AVS-PR [Ambassador] by PRVAO [OVP] for those purposes")[4].

---

[4] *Véase*, Apéndice del recurso de apelación, pág. 46 (énfasis suplido).

En otras palabras, a tono con nuestra función interpretativa del *Contrato* en controversia, podemos concluir que la sección 14 nos deja meridianamente claro que la OVP no actúa como patrono de los empleados del Apelante, por lo que este último es el único responsable de costear los gastos relacionados sus salarios, compensaciones y otros beneficios económicos. Ahora bien, la sección 29 (n) del referido *Contrato* regula lo concerniente al desembolso de los fondos federales relacionados a **emergencias o desastres en las facilidades**. En este contexto, ambas partes consignaron su voluntad y acordaron que Ambassador pudiera reclamar los mismos para el pago de los salarios de sus empleados; **obviamente, siempre y cuando estuvieran relacionados con proyectos efectuados en la Casa del Veterano que pudieran ser utilizados para la operación de dichas facilidades y dentro de dicho contexto de emergencias o desastres**.

Nótese, pues, que conforme las cláusulas contractuales ante nuestra consideración, la OVP actúa únicamente como un recipiente de los fondos federales de FEMA, lo cuales pueden ser utilizados para la operación del establecimiento dentro del contexto específico de desastres y emergencias. Entendemos que el alcance de las secciones 14 y 29 (n) del *Contrato* son diferenciables y atienden asuntos distintos. En este contexto, el distinguido juzgador de instancia concluyó que luego de examinar el proceso de desembolso de FEMA, **según detallado en la solicitud de desestimación de la OVP**, eran las propias regulaciones federales las que imposibilitaban acceder a lo solicitado por Ambassador, toda vez que dichos fondos no podrán ser reembolsables para los propósitos que el Apelante solicita porque no quedaron contemplados cuando la OPV generó el reclamo. Sin embargo, al estudiar tanto el legajo apelativo como los autos electrónicos del Sistema Unificado de Manejo y Administración de Casos (SUMAC), no hallamos que se hubiera aportado prueba alguna para demostrar ese hecho. Simplemente, el foro primario adjudicó dicho asunto con meros planteamientos del Gobierno. Sobre este particular, corresponde que, a esta etapa de los procedimientos, se efectúe

un descubrimiento de prueba y, posteriormente, cada parte deberá presentar la evidencia que entienda pertinente para probar sus alegaciones y teorías legales.

Por otro lado, el foro *a quo* concluyó que a base de los requisitos que impone FEMA para el desembolso de los fondos en controversia, en unión con las alegaciones esgrimidas en la *Demanda Enmendada*, el Apelante no contaba con evidencia demostrativa de cumplimiento con dichos requerimientos. Como hemos mencionado anteriormente, a esta etapa de los procedimientos es innecesario y hasta oneroso requerirle a la parte promovente de un litigio que aporte evidencia para probar sus alegaciones. Nuestro ordenamiento procesal y evidenciario no requiere tal peso a etapas tan tempranas del litigio. Adviértase que estamos en un contexto de una moción de desestimación, al amparo de la Regla 10.2 (5) de Procedimiento Civil, *supra*, y no ante una solicitud de disposición sumaria, de conformidad con la Regla 36 de Procedimiento Civil, 32 LPRA Ap. V, R. 36.

En lo correspondiente a los fondos del COVID-19, el TPI coligió que debido a que los incisos (m), (p) y (q) de la Sección 2 de la Parte III del *Contrato* restringen unos fondos asignados por el Congreso de los Estados Unidos con anterioridad a la ejecución del acuerdo para la emergencia del COVID-19, lo único que podía solicitar Ambassador con relación a los mismos era aquello detallado en dichas cláusulas contractuales, a saber: *chiller*, un generador eléctrico y un tanque para almacenar *diesel*. Sostenemos que dicha interpretación del *Contrato* es una muy limitada. Nos explicamos.

La Sección 38 de la Parte V del *Contrato*, que contiene las disposiciones misceláneas del mismo, dispone que los encabezados de las secciones en el *Contrato* se incluyeron con el único propósito de hacer referencia y **no constituirán una parte del mismo para ningún otro propósito**.[5] Es, pues, evidente que indistinto de que las cláusulas del *Contrato* expusieran un encabezamiento, los mismos no pueden ser

---

[5] *Véase*, Apéndice del recurso de apelación, pág. 109 (traducción nuestra).

utilizados para ningún otro fin ulterior. Así pues, de una somera lectura de la sección 29 (n) del *Contrato*, se desprende que cuando se hace alusión a FEMA es precisamente en el encabezamiento de dicha cláusula. Sin embargo, cuando analizamos el contenido específico de dicha sección, notamos que las partes no limitaron los fondos federales a lo que FEMA distribuyera, sino más bien, permite la utilización de cualquier subvención federal relacionado con las operación de las facilidades de la Casa del Veterano para emergencias y desastres, en general. A la luz de lo anterior, concluimos que la interpretación que le imprimió el TPI a los incisos (m), (p) y (q) de la Sección 2 de la Parte III del *Contrato* fue una limitada y no consideró que la reclamación por los fondos que pudiera haber asignado el gobierno federal a la OVP por emergencias y desastres también podría incluir asuntos relacionados con la pandemia del COVID-19.

En suma, tomados como ciertos todos los hechos bien alegados en la *Demanda Enmendada* y a interpretarlos de la manera más beneficiosa para el demandante, de conformidad con las disposiciones contractuales en controversia, colegimos que el TPI erró al desestimar el pleito que nos ocupa.

**IV.**

Por los fundamentos que anteceden, los cuales hacemos formar parte integral del presente dictamen, se *revoca* la *Sentencia* apelada y se devuelve el caso para la continuación de los procedimientos.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones